**In re BOCO ENTERPRISES, INC., Debtor.**

**BOCO ENTERPRISES, INC., Plaintiff,**

**v.**

**SAASTOPANKKIEN KESKUS–OSAKE– PANKKI, Defendant.**

**SAASTOPANKKIEN KESKUS–OSAKE– PANKKI, Defendant–Counterclaim Plaintiff,**

**v.**

**Bjorn KORITZ and Patricia Koritz, Counterclaim Defendants.**

**Bankruptcy No. 93 B 42331 (JLG). Adv. No. 93–9258A (AJG).**

United States Bankruptcy Court, S.D. New York.

Jan. 17, 1997.

Hughes Hubbard & Reed, L.L.P., New York City, for Skopbank; David W. Wiltenburg, of counsel.

Harris & Trien, L.L.P., New York City, for Bjorn Koritz and Patricia Koritz; Robert M. Trien, of counsel.

*MEMORANDUM DECISION ON SUBJECT MATTER JURISDICTION OVER COUNTERCLAIM DEFENDANTS AND SUMMARY JUDGMENT ON LIABILITY OF GUARANTORS*

ARTHUR J. GONZALEZ, Bankruptcy Judge.

Boco Enterprises, Inc. ("Boco") was incorporated on or about January 1988 to purchase and develop certain real property located in Greenwich, Connecticut (the "Property"). Bjorn and Patricia Koritz are the sole shareholders, officers and directors of Boco. Saastopankkien Keskus–Osake–Pankki ("Skopbank") is a banking corporation organized under the laws of the Republic of Finland.

In January 1988, in order to finance the purchase of the Property, Boco entered into a Eurodollar Credit Agreement (the "Agreement"), dated January 22, 1988, in which Boco agreed to borrow $2 million from Skopbank and to repay the principal sum, with interest, as provided in the Agreement. Boco agreed to pay all costs associated with enforcement of the Agreement, including costs sustained as a result of any default by Boco. The loan was secured by a mortgage on the Property. Bjorn and Patricia Koritz personally guaranteed the payment of all obligations of Boco under the Agreement. Pursuant to the terms of the guaranty, dated January 28, 1988, (the "Guaranty"), the Koritzes absolutely and unconditionally guaranteed Boco's obligations under the Agreement irrespective of any lack of validity of the Agreement; any change in a term of an obligation; or any other defense available to, or any discharge of, Boco with respect to those obligations, or the Koritzes with respect to the Guaranty. In addition, the Koritzes waived any requirement that Skopbank exhaust any right to take action against Boco. The Agreement and the Guaranty each provided that it was governed by New York law. The parties consented to jurisdiction in the New York County federal courts. Skopbank advanced funds pursuant to the Agreement.

The parties executed various amendments to the Agreement and, in an amendment to the Guaranty, the Koritzes reaffirmed their obligations under the Guaranty respecting all documents related to the Agreement as amended and as those documents might be "further amended, at any time or from time to time."

In July 1991, Boco failed to pay an installment under the Agreement and Skopbank declared a default. In March 1992, Skopbank commenced a foreclosure action in a Connecticut state court against Boco on the contract obligations, and against the Koritzes on the Guaranty.

That action was stayed when, on May 5, 1993, the Koritzes caused Boco to file a petition under chapter 11 of title 11 of the United States Code in the U.S. Bankruptcy Court for the Southern District of New York.

Prior to Boco's bankruptcy filing, the Property had been divided into two parcels, one of which included a residence. In 1990, the Koritzes moved into the residence and caused Boco to convey the parcel with the residence to themselves, personally. No consideration was paid to Boco for the conveyance. The Koritzes reconveyed the parcel back to Boco two days before the bankruptcy filing to ensure that Boco's bankruptcy petition would stay the foreclosure action against all of the Property. Post-petition, the Koritzes continued to occupy the residence rent-free for three years until, upon application by Skopbank, the Court ordered the Koritzes to compensate Boco's estate for their continued occupancy.

On March 29, 1993, Skopbank filed a proof of claim for the principal due, unpaid interest and for unreimbursed legal fees and expenses. Since the filing of the proof of claim, additional amounts due for interest and costs have accrued. Skopbank's claim was subsequently allowed as part of the Plan of Reorganization approved by the Court.

On July 12, 1993, Boco commenced the instant adversary proceeding interposing defenses to Skopbank's claim based upon, among other things, breach of contract, fraud, and negligence. In the adversary proceeding, Skopbank asserted counterclaims against the Koritzes based upon their guaranty of Boco's obligations. On July 26, 1994, the Court granted Skopbank's motion to dismiss Boco's claims and dismissed each of Boco's claims with prejudice.

Skopbank proposed a liquidating Plan of Reorganization (the "Plan") to which it would contribute $40,000 to fund payment of administrative expenses and a distribution to unsecured creditors, other than Skopbank. On October 28, 1994, the Court signed an Order confirming the Plan proposed by Skopbank. The combined effect of the dismissal of the claims asserted by Boco against Skopbank and of the provision of the Plan allowing Skopbank's claim was to establish Skopbank's right to payment against Boco. Pursuant to the Plan, the Property was sold and, on January 10, 1995, an Order was entered confirming the sale. Skopbank credit bid $1.5 million, as permitted by the Plan, and

was the successful bidder. This left a deficiency claim owing on Skopbank's claim against Boco. The remaining issues to be determined by this Court are the calculation of the amount of the deficiency and the liability of the Koritzes on the Guaranty. Skopbank now moves for summary judgment on the second counterclaim asserted against the Koritzes seeking to enforce the Guaranty (the "Second Counterclaim").

The Koritzes cross-move to dismiss Skopbank's Second Counterclaim against them contending that this Court lacks subject matter jurisdiction over this counterclaim. Alternatively, the Koritzes argue that there are questions of fact that preclude summary judgment concerning the claims based on the Guaranty. The Koritzes also cross-move seeking leave to serve an amended answer adding defenses and counterclaims against Skopbank.

### SUBJECT MATTER JURISDICTION

An action is related to bankruptcy if its outcome "in any way impacts upon the handling and administration of the bankrupt estate." *Pacor, Inc. v. Higgins (In re Pacor, Inc.)*, 743 F.2d 984, 994 (3d Cir.1984). An action by a creditor against a guarantor of the debtor's obligations, where the guarantor was an officer, director and shareholder of the debtor, is a proceeding within the "related to" jurisdiction of the bankruptcy court. *Young v. Sultan Ltd. (In re Lucasa Int'l Ltd.)*, 6 B.R. 717, 718–19 (Bankr.S.D.N.Y. 1980). This is because the outcome of the creditor's action against the guarantor affects that "creditor's status vis a vis other creditors" and, therefore, affects administration of the estate. *Pacor*, 743 F.2d at 995.

While conceding that, prior to the confirmation of Boco's Plan of Reorganization, this Court had jurisdiction over the claims asserted against the Koritzes under the Guaranty, the Koritzes contend that because a Plan has been confirmed, Boco's estate will not be affected by the outcome of this litigation and this Court is divested of jurisdiction over the Second Counterclaim asserted by Skopbank against the Koritzes.

Skopbank responds that, given that the Second Circuit, in *Porges v. Gruntal & Co., Inc. (In re Porges)*, 44 F.3d 159, 162 (2d Cir.1995), held that the dismissal of an underlying bankruptcy case did not automatically strip the Court of jurisdiction over a "related to" adversary proceeding, *a fortiori*, confirmation of a Plan should not divest the Court of jurisdiction over a "related to" proceeding.

■ In *Porges*, the Second Circuit noted that while adversary proceedings "related to" the bankruptcy case were ordinarily dismissed following dismissal of the main bankruptcy case, this result was not compelled by the Bankruptcy Code. *Porges*, 44 F.3d at 162. Rather, retention of jurisdiction over a "related to" proceeding after dismissal of the main case was left to the sound discretion of the bankruptcy court. The Second Circuit provided four factors to guide the bankruptcy court in determining whether to retain jurisdiction of the "related to" proceeding. These factors are judicial economy, convenience to the parties, fairness, and comity. *Porges*, 44 F.3d at 163.

To reach this result, the *Porges* court analogized the bankruptcy court's exercise of retention of jurisdiction over the adversary proceeding to that of the district court's retention of supplemental jurisdiction, specifically, jurisdiction of pendant state claims following dismissal of all federal claims. *See Porges*, 44 F.3d at 162.

■ The "related to" proceeding in issue before this Court is more closely analogized to cases concerned with another form of supplemental jurisdiction, specifically, cases that have addressed a district court's retention of jurisdiction over an "ancillary proceeding"[1] after the court is no longer involved with deciding the main cause of action.[2]

In *Dery v. Wyer*, 265 F.2d 804, 808 (2d Cir.1959), the Second Circuit found that ancillary jurisdiction over a third-party complaint was not lost when the main cause of action was settled. The Court found that "the sufficiency of jurisdiction should be determined once and for all at the threshold and if found to be present then, should continue until final disposition of the action." *Dery v. Wyer*, 265 F.2d at 808.

Informing the *Dery v. Wyer* court's decision were policy considerations. The court was concerned that a ruling which held that a third party ancillary proceeding would not survive a disposition of the main cause of action would result in a waste of effort if the parties settled the main action in advance of a decision on the third party claim. In addition, such a ruling would discourage both settlements and "adjudications on motions . . . in advance of trial." *Dery v. Wyer*, 265 F.2d at 808. The *Dery v. Wyer* court was also concerned that, in cases where a court's initial invocation of jurisdiction over a third-

---

**1.** Ancillary jurisdiction ordinarily involves claims by a defending party who has been "haled into court against his will" or a party who might forfeit rights if precluded from asserting them in the ongoing action. *Owen Equip. and Erection Co. v. Kroger*, 437 U.S. 365, 376, 98 S.Ct. 2396, 2404, 57 L.Ed.2d 274 (1978).

**2.** The district court's exercise of supplemental jurisdiction, whether ancillary or pendent, has been codified in 28 U.S.C. § 1367. This section also gives the court discretion to decline its exercise under certain circumstances, including when the district court dismisses all of its original jurisdiction claims. This implies that the court may, in its discretion, retain jurisdiction even where it dismisses those claims over which it had original jurisdiction.

While in our analysis, we considered actions courts take when determining whether to retain jurisdiction over ancillary matters, this is not meant to imply that we view this matter as ancillary or that we view bankruptcy courts as having authority to entertain ancillary matters. Rather, when the claims against the guarantors were initially brought before this Court, we had jurisdiction over them as claims "related to" the bankruptcy case and we used the same analysis as district courts do when they determine, within their discretion, to retain jurisdiction on matters over which they originally had jurisdiction.

We need not and do not address the issue of whether bankruptcy courts have supplemental jurisdiction, other than to recognize that there are divergent views on the issue. Compare *Walker v. Cadle Co., Inc. (In re Walker)*, 51 F.3d 562, 572 (5th Cir.1995) (finding that § 1367 does not give bankruptcy courts supplemental pendant party jurisdiction) with *Jones v. Woody (In re W.J. Services, Inc.)*, 139 B.R. 824, 826 (Bankr. S.D.Tex.1992) (asserting that bankruptcy court does have supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because bankruptcy court is a unit of the district court.)

party defendant is proper, such a ruling would impact on the utility of Fed.R.Civ.P. 14 impleader.

■ These same types of considerations are before this Court. Skopbank might not have sought adjudication of its Fed.R.Civ.P. 12(b)(6) motion for dismissal of Boco's claim in advance of trial if it believed that were it successful on that motion, the bankruptcy court would be divested of jurisdiction over the counterclaim action against the Koritzes. This result would lead to inefficiencies because it would discourage parties from availing themselves of dispositive motions in situations where such procedures might properly be invoked. In addition, divesting the Court of jurisdiction would impact on the effectiveness of the comprehensive grant of jurisdiction given to the bankruptcy court to adjudicate all matters affecting administration of the bankruptcy estate. This is because parties would be deterred from bringing all related actions into the bankruptcy court were they aware that they could easily be faced with the predicament of having to recommence a particular action in another forum.

This Court finds that because we had jurisdiction to adjudicate the Guaranty-based claim against the Koritzes as a "related to" proceeding when it was initially brought before this Court, it was within this Court's discretion to retain jurisdiction over this claim after resolution of the dispositive motion with respect to the main cause of action. This Court exercised that discretion when it entered the order confirming the Plan.

The Court's decision to retain jurisdiction of the Second Counterclaim also comported with the factors requiring consideration as delineated by the Second Circuit in *Porges*. Pursuant to the order granting the motion to dismiss Boco's complaint against Skopbank and to the order of confirmation approving the terms of the Plan, the bankruptcy court dismissed Boco's defenses to Skopbank's claim and established the validity of the claim in Boco's Plan. The order confirming the Plan was not appealed, therefore, there is a final adjudication of Boco's debt to Skopbank. Thus, the bankruptcy court has already established the validity of the debt that the Koritzes guaranteed. While the relief re-

quested by Skopbank with respect to the Guaranty is intertwined with the ruling establishing Boco's debt, whether the proceeding concerning the Guaranty is determined in the bankruptcy court or another court, the bankruptcy court's determination with respect to the validity of Boco's debt to Skopbank would be res judicata. Thus, it does not appear that any judicial economy would result by preferring retention of the proceeding in this Court over the state court. Nor is comity implicated because New York law on guarantors is not unsettled. *See Independent Bankers Ass'n of N.Y. State, Inc. v. Marine Midland Bank,* 757 F.2d 453, 464 (2d Cir.1985) (to promote justice and comity, issues of unsettled state law warrant a "surerfooted" state court adjudication). Moreover, if the action is not heard here, it would probably not be heard in a New York state court but, rather, would likely revert to the Connecticut state court where the action was pending prior to the bankruptcy court. Thus, the Connecticut state court would be called upon to interpret New York law. Therefore, judicial economy and comity do not clearly favor either forum.

However, fairness and convenience to the parties clearly favor retention of jurisdiction by the bankruptcy court. Skopbank notes that the provisions of the Plan, including retention of jurisdiction over the Second Counterclaim asserted in the adversary proceeding, formed the basis upon which it proposed and funded the Plan, thereby permitting payment of administrative expenses and distributions to unsecured creditors. The Koritzes are not remote-third parties who were brought into this bankruptcy court proceeding. Rather, they were Boco's sole shareholders, officers and directors who, in that capacity, caused Boco to file for bankruptcy in the Southern District of New York and who caused Boco to commence this adversary proceeding. Prior to the bankruptcy filing, Skopbank had commenced a foreclosure action in Connecticut against Boco, on the contract obligations, and against the Koritzes, as guarantors. The continuation of the Connecticut proceeding would have allowed Skopbank to have all of its claims related to the foreclosure action fully adjudicated in one

proceeding. It was pursuant to the Koritzes' directive that Skopbank was forced from the Connecticut state courts into the Southern District of New York bankruptcy court. Now, the Koritzes seek to have the action revert back to the Connecticut state court and prevent the litigation from concluding in the forum they directed Boco to select.

It would be unfair and inconvenient to Skopbank to delay this matter further by requiring it to return to the Connecticut state court when the very individuals who seek this result were the parties who were instrumental in forcing Skopbank into this forum. The Koritzes did not object to this retention of jurisdiction, nor did they appeal the confirmation order which delineated these terms.

The Koritzes argue that their failure to appeal the confirmation order should be excused because the terms of the Plan regarding retention of jurisdiction over the counterclaims against them were ambiguous. This contention is without merit. Section 10.01(d) of the Plan provides that the bankruptcy court retained jurisdiction "to determine *any and all* applications, motions, *adversary proceedings* and contested matters that may be pending [3] on the Consummation Date, including, *without limitation*, the Adversary Proceeding, the Counterclaims and any counterclaims or cross-claims thereunder." (emphasis added). The Koritzes assert that the Plan retained jurisdiction over the Adversary Proceeding and Counterclaims, which were defined terms in the Plan that did not include the counterclaims against the Koritzes. However, this Court's retention of jurisdiction as described in section 10.01(d) is not limited in this way. Rather, in section 10.01(d), this Court retained jurisdiction over "*any and all* . . . adversary proceedings." (emphasis added).

The defined terms are merely listed as examples of the types of proceedings over which jurisdiction was retained. They follow the term "including" which is not limiting. In addition, the clause expressly states that the list following the term "including" is "without limitation." Therefore, this Court is not required to interpret the defined terms or the limitation allegedly effected by the use of these terms or how the ensuing phrase would impact on them. Thus, the Plan and confirmation order provide for this Court's retention of jurisdiction over all adversary proceedings, which includes this adversary proceeding and its concomitant Second Counterclaim against the Koritzes. In addition, the Koritzes were on notice concerning this Court's retention of jurisdiction over the Second Counterclaim against them because it was clearly explained in the disclosure statement. In Article III, Section B, of the disclosure statement, entitled Pending and Potential Litigation, subsection two describes that when Boco's claim against Skopbank was dismissed, the counterclaim against the Koritzes, based upon their individual guaranties, was not dismissed and that counterclaim remained pending. Moreover, the order confirming the Plan expressly provided in the ninth decretal paragraph that the Plan did "not affect, discharge, diminish or impair any liability" of the Koritzes with respect to the Guaranty claims.

Finally, the Koritzes argue that the combined effect of sections 6.05 [4] and 6.06 of the Plan requires that no provision of the Plan would impact on the guarantor claims against the Koritzes and, therefore, it was contemplated that the counterclaim litigation against them would not be conducted in the bankruptcy court.

Section 6.05 of the Plan, entitled Transfer of Counterclaims Against Boco, provided that

---

**3.** Due to a ministerial error by the Clerk's office, this adversary proceeding was closed on July 28, 1994 when Boco's claim against Skopbank was dismissed. After a hearing, at which Skopbank argued, and the Koritzes conceded, that the closing of the case was inadvertent, an order was entered on April 10, 1995 reopening this adversary proceeding and deeming it a continuing proceeding, to the extent not disposed of by the July 26, 1994 order dismissing Boco's claim against Skopbank. The counterclaims against

the Koritzes were not disposed of in the July 26, 1994 order. Therefore, on the Consummation Date, these counterclaims were part of a pending adversary proceeding within the definition of the Plan.

**4.** In their brief, the Koritzes actually cite to section 6.0. The Plan does not have a section 6.0, however, the section that includes language closest to that quoted by the Koritzes is section 6.05.

the transfer of any action Boco brought or could have brought against Skopbank was transferred to Skopbank. In exchange for this transfer, Skopbank transferred all of the Counterclaims against Boco to the estate, other than claims based on the Agreement between Skopbank and Boco. The section further provides that "[n]o transfer hereunder or otherwise under the Plan shall affect or reduce in any way Skopbank's Guaranty Claims or any deficiency claim of Skopbank arising upon the sale of the Greenwich Property."

The Plan provides that transfers under the Plan would not affect or reduce the Guaranty Claims, which were defined as "the counterclaims asserted by Skopbank against the Koritzes personally in the Answer and Counterclaims, dated August 23, 1993, to Boco's Adversary Proceeding, on account of the Koritzes' personal guaranty of Boco's debts." The counterclaims asserted by Skopbank in the August 23, 1993 counterclaim were asserted in Boco's Adversary Proceeding pending in the bankruptcy court. Moreover, the fact that the transfer does not affect the Guaranty Claim has no bearing on where the Guaranty Claim is adjudicated. That issue is controlled elsewhere in the Plan.

This Court finds that, post-confirmation, it had discretion to retain jurisdiction over Skopbank's "related to" Second Counterclaim against the Koritzes and the Court exercised that discretion and determined to retain that jurisdiction. The retention of jurisdiction was implemented in the Court's order confirming the Plan.

## SUMMARY JUDGMENT ON THE GUARANTY CLAIMS

Skopbank has moved for summary judgment on its Second Counterclaim against the Koritzes seeking to establish the Koritzes liability as individual guarantors of Boco's obligations under the Agreement.

Skopbank contends that the Guaranty executed by the Koritzes was absolute and unconditional and that the Koritzes waived any defenses that might have been available to Boco. Further, Skopbank argues that all of the defenses proposed by the Koritzes have already been adjudicated and found to be

without merit in the Court's ruling dismissing Boco's claims against Skopbank. Skopbank asserts that, therefore, the Koritzes are liable on Boco's obligations to Skopbank which obligation was established in the confirmed Plan.

The Koritzes argue that their obligation under the Guaranty was to pay any obligation due under the terms of the Agreement and that the terms of the Agreement were altered by an amendment the parties entered into which allowed them to convert the currency in which Boco's obligation was due. The Koritzes maintain that Skopbank allowed certain switches in the currency in which the obligation was due but that when Skopbank barred further switches of the currency, the Koritzes were no longer liable on the Guaranty.

Pursuant to the Guaranty, the Koritzes agreed to "jointly and severally unconditionally guarantee the punctual payment when due ... of all obligations of [Boco] now or hereafter existing under the [Agreement]." The Koritzes agreed that their liability was "absolute and unconditional" irrespective of, among other things, any lack of enforceability of the Agreement or other related instruments; or irrespective of any defenses available to Boco in respect of the obligations; or irrespective of any defenses available to the Koritzes in respect of the Guaranty. Their liability was also absolute and unconditional irrespective of "any change in the time, manner or place of payment of, or in any other term of, all or any of [Boco's obligations], or any other amendment or waiver of or any consent to departure from the [Agreement, or other related documents]. The Guaranty was also described as a "continuing guaranty" which was to remain in full force and effect until payment was made in full of all of Boco's obligations under the Agreement and of all other amounts payable under the Guaranty. In their December 1989 Amendment to the Guaranty, the Koritzes reaffirmed their obligations under the Guaranty respecting all documents related to the Agreement as then amended and as they might be further amended.

New York courts recognize and enforce absolute and unconditional guarantees which specifically preclude guarantors from asserting any defenses, *Citibank v. Plapinger,* 66 N.Y.2d 90, 93, 495 N.Y.S.2d 309, 310, 485 N.E.2d 974, 975 (1985), or counterclaims. *European American Bank v. Lofrese,* 182 A.D.2d 67, 73, 586 N.Y.S.2d 816, 819 (2d Dep't 1992); *First New York Bank for Business v. DeMarco,* 130 B.R. 650, 654 (S.D.N.Y. 1991). When a guarantor has given an unconditional guaranty, its liability is clear as a matter of law. *Milliken & Co. v. Stewart,* 182 A.D.2d 385, 387, 582 N.Y.S.2d 127, 129 (1st Dep't 1992).

A guarantor may also consent in advance to the continued viability of its guaranty notwithstanding modification to the underlying agreement. *Banco Portugues do Atlantico v. Asland,* 745 F.Supp. 962, 968 (S.D.N.Y.1990). The Koritzes guaranteed all obligations of Boco "now or hereafter existing" under the Agreement. The Guaranty was also described as a continuing guaranty that remained in effect until payment of Boco's obligations and other amounts due under the Guaranty.

In addition, the Koritzes' liability under the Guaranty was absolute and unconditional irrespective of any change in any term of all or any of Boco's obligations or "any other amendment or waiver of or any consent to departure from the [Agreement]. The scope of the Koritzes' guaranty was plain and unambiguous and sufficiently broad to encompass the switches in currency that Skopbank allowed. *Banco,* 745 F.Supp. at 968, 970. The plain language of the Guaranty precluded the Koritzes from raising any defense that might be available to Boco. *Gannett Co., Inc. v. Tesler,* 177 A.D.2d 353, 577 N.Y.S.2d 248, 249 (1st Dep't 1991). Further, as noted by Skopbank, the Guaranty was not tied to a specific currency. Rather, the Guaranty was based upon Boco's obligations under the Agreement, including any changes or modifications to that Agreement. Skopbank also points to the fact that the Koritzes themselves controlled any amendments made by Boco concerning its obligations under the Agreement. Moreover, in this case, the liability of the Koritzes is clear because Boco's obligation under the Agreement has already been established.

The Koritzes argue that even if a guaranty is absolute and unconditional, the guarantor may be relieved of liability if the lender violated either the terms of the guaranty or a subsequent agreement or public policy. The Koritzes contend that Skopbank entered into a subsequent agreement to allow Boco to switch the currency in which the loan was due and when Skopbank refused to continue to allow switches in currency, the Koritzes were relieved of their liability on the Guaranty. The Koritzes cite to *Canterbury Realty & Equipment Corp. v. Poughkeepsie Sav. Bank,* 135 A.D.2d 102, 524 N.Y.S.2d 531 (3d Dep't 1988), to support this proposition. However, the *Canterbury* court was concerned with whether the lender had complied with the terms of the underlying agreement because the guarantors were only liable on the guaranty if the underlying obligor had a liability that was due. The *Canterbury* court denied summary judgment on the guaranty because there was a factual issue as to whether, because of the lender's subsequent actions, there was in fact any underlying liability due.

In the case at bar, Boco's liability to Skopbank has been established by the combined effect of the Court's decision on Boco's liability and the order confirming the Plan which allowed Skopbank's claim against Boco. The Koritzes unconditionally guaranteed Boco's obligation and, because Boco's obligation has been judicially established, the Koritzes are liable on their guaranty as a matter of law.

Moreover, the issue of whether Skopbank was obligated to switch currencies upon Boco's request was already litigated in this adversary proceeding and Boco's claims on that issue were dismissed. In Boco's complaint against Skopbank, Boco contended that it was authorized to switch the mortgage loan between various currencies to avail itself of fluctuations in their comparative value. Boco argued that Skopbank breached the Agreement by refusing to continue to comply with Boco's requests to switch currencies in

which the loan was due.[5] The Court found that neither the Agreement nor any amendments thereto provided Boco with the right to direct Skopbank to execute currency trades. As there was nothing in writing evidencing such an agreement, it was barred by New York's Statute of Frauds.

The Koritzes argue that in reaching the decision that Boco was liable to Skopbank under the Agreement, the Court was not asked to and did not consider a letter dated December 11, 1990 (the "Commitment Letter") from Skopbank to the Koritzes and Boco which allegedly delineated certain modifications to the Agreement, including the granting of rights to convert the loan, at certain intervals, to other currencies.

This Commitment Letter was available to Boco and the Koritzes when the Court was considering Boco's liability under the Agreement, as evidenced by the fact that the Koritzes attached the Commitment Letter to a pleading in support of another issue. In addition, at a July 27, 1993 examination of Mr. Koritz, he was questioned about the effects of the Commitment Letter. Yet, the Commitment Letter was not introduced to support the alleged agreement to authorize currency switches. The Koritzes cannot use this proceeding to collaterally attack the determination already rendered on Boco's liability to Skopbank under the Agreement.[6]

The Koritzes argue that even if their guaranty were continuing and they were liable irrespective of changes in the terms of the loan, the parties executed a formal amendment to the Guaranty in one instance when they agreed to change the currency in which the loan was payable. They executed this formal amendment, allegedly, because the parties recognized the increased risk posed to the Koritzes. Therefore, the Koritzes argue that subsequent changes in the currency in which the loan was due, without formal amendment to the Guaranty, relieved them of their obligation.

The language of the Guaranty, however, is broad enough to preclude this defense because, according to its terms, the guarantors are liable on Boco's obligations under the Agreement irrespective of any change "in any term of" the Agreement. In addition, the guarantors are liable irrespective of "any other amendment or waiver of or any consent to departure from the [Agreement]." Moreover, the guarantors are liable irrespective of "any other circumstances which might otherwise constitute a defense available to . . . the [g]uarantors in respect of [the] Guaranty." Therefore, the Koritzes explicitly waived this defense.[7] *Banco,* 745 F.Supp. at 971.

A guaranty is "an agreement that imposes on the guarantor the obligation of insuring the performance of another." *Banco,* 745 F.Supp. at 974. Boco's obligation was established by the Court and, pursuant to their absolute and unconditional guaranty, the Koritzes are liable to Skopbank.

Fed.R.Civ.P. 56(c), made applicable to a bankruptcy proceeding by Fed.R.Bankr.P. 7056 provides that summary judgment shall be rendered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." If the issue presented is the construction of a contract, summary judgment is appropriate if the contract is not ambiguous. *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992.); *Bethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 460, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 593 (1957). A contract is not ambiguous if its language has a definite and precise meaning. *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,*

---

**5.** The repayment obligation under the Agreement was periodically converted into different currencies.

**6.** Without addressing the merits of the arguments advanced by the Koritzes with respect to the Commitment Letter, the Court notes that the proper procedure to raise the issue of the Commitment Letter is a motion for reconsideration of the Court's ruling on Boco's liability under the Agreement. However, it appears unlikely that the standard for reconsideration would be met

because, among other things, this document was available to Boco and the Koritzes during the pendency of the claims asserted by Boco against Skopbank but they chose not to use it. Moreover, the action is probably time barred. *See,* Fed.R.Civ.P. 60(b).

**7.** We also note that Boco's consent to any amendment to the Agreement was at the Koritzes' direction.

889 F.2d 1274, 1277 (2d Cir.1989). If the language is plain, it does not become ambiguous because the parties promote different interpretations of it, especially if one interpretation strains the contract language. *Id.* Whether or not a contract term is ambiguous is a threshold question of law resolved by the court. *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987); *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990).

This Court finds that the language of the Guaranty is plain and unambiguous. The Koritzes agreed to absolutely and unconditionally guarantee payment of Boco's obligations under the Agreement. Boco's obligations under the Agreement have been adjudicated by the Court and Boco's liability thereunder has been established. Therefore, under the plain terms of the Guaranty, the Koritzes are liable to Skopbank for payment of Boco's obligations pursuant to the Agreement. Thus, Skopbank's motion for summary judgment against the Koritzes, based upon their guaranty, is granted.

Finally, because the Koritzes' unconditional guaranty precludes them from asserting the proposed counterclaims, their motion to amend their counterclaim is denied.

## CONCLUSION

The Court finds that we have subject matter jurisdiction to determine the issue of the Koritzes' liability pursuant to the Guaranty. Initially, the Court had "related to" jurisdiction over Skopbank's Second Counterclaim against the Koritzes as guarantors of Boco's liability. When Boco's Plan was confirmed, the Court had discretion to retain jurisdiction over this counterclaim and exercised that discretion when it confirmed the Plan which included retention of jurisdiction.

The Court finds that the Koritzes are liable to Skopbank as guarantors of Boco's obligations under the Agreement. Boco's obligations under the Agreement were adjudicated and established by the Court and, pursuant to the plain and unambiguous terms of the Guaranty, the Koritzes, absolutely and unconditionally, guaranteed Boco's obli-

gations. Therefore, Skopbank's motion for summary judgment against the Koritzes on the Second Counterclaim is granted.

The Court denies the Koritzes motion to amend their counterclaim.

Skopbank is to settle an order on five (5) days' notice, consistent with this Memorandum Decision.

Within ten days of entry of the order, Skopbank and the Koritzes are to submit their respective calculations and supporting documentation of the amount of the deficiency due under the Guaranty.